UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NATHANIEL J. STROTHER,      )
        Plaintiff           )
            v.              )    C.A. No. 09-cv-30122-MAP
                            )
MICHAEL J. ASTRUE,          )
COMMISSIONER, SOCIAL        )
SECURITY ADMINISTRATION,    )
        Defendant           )

MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
DEFENDANT'S MOTION TO AFFIRM DECISION OF THE COMMISSIONER
(Dkt. Nos. 12 & 15)

March 2, 2011

PONSOR, D.J.

## I. INTRODUCTION

This action seeks review of a final decision of the

Commissioner of Social Security ("Commissioner") denying

Plaintiff's applications for disability insurance benefits

("DIB") and Supplemental Security Income ("SSI"). Plaintiff

applied for DIB and SSI on October 3, 2007, alleging

disability since November 18, 2002, due to, among other

ailments, the onset of fibromyalgia.

Plaintiff's claim was denied initially on January 16,

2008, and again on appeal on September 17, 2008. (A.R. 82-

84.)  An administrative hearing was held on January 27,

2009, before an administrative law judge ("ALJ"), who denied

Plaintiff's claim two months later.  (A.R. 18-29.)  On June

22, 2009, the Decision Review Board issued a final decision

in which it amended the ALJ's decision, changing the

rationale but leaving the conclusion intact.  (A.R. 18.)

Plaintiff now moves for judgment on the pleadings (Dkt.

No. 12), and Defendant moves for an order affirming the

decision of the Commissioner (Dkt. No. 15).  This case was

set for argument on April 22, 2011, but upon review of the

papers and for the reasons set forth below, the court has

concluded that no argument is necessary.  The court will

allow Plaintiff's motion (Dkt. No. 12) and deny Defendant's

motion (Dkt. No. 15).

## II.  FACTS

### A.  Personal Life and Work Experience.

Plaintiff, presently fifty-seven years old, was fifty-

four at the time his insured status lapsed on December 31,

2007.  He alleges disability since November 18, 2002, due to

fibromyalgia,[1] chronic fatigue syndrome, anxiety, depression, sleep apnea, and back pain. (A.R. 118, 133.)

Plaintiff is married to his wife, Kathleen. The couple relocated from Georgia in 2003 and currently reside in Pittsfield, Massachusetts. Plaintiff is 5'5" and weighs approximately two hundred pounds. He has never had a problem with alcohol abuse, street drug use, or the criminal justice system. (A.R. 308-14.) He is a high school graduate with one year of college and specific training in computers, creative writing, and workplace diversity. (A.R. 123, 129, 146.) Plaintiff previously worked as a telephone systems technician and data processing associate at AT&T for thirty years until he retired on November 15, 2002. (A.R. 134-35.) He receives a monthly pension from AT&T. (Id.)

B.    Medical History.

Plaintiff has suffered from chronic neck and back pain since the early 1990s. (A.R. 273.) Plaintiff had back surgery to remove a herniated disc in July 1993. (A.R. 222-23.)

---

[1] For a detailed description of this ailment, see footnote 2 infra.

On November 7, 2002, Plaintiff saw pain management specialist Dr. John Gatell in Atlanta, Georgia, complaining of both pain and stress associated with retirement.  Dr. Gatell diagnosed Plaintiff with fibromyalgia, chronic fatigue syndrome, generalized pain syndrome, anxiety, and depression, but indicated Plaintiff was "excellent overall" and was tolerating being weaned off of narcotic pain medication without an increase in his pain. (A.R. 278.)

Plaintiff saw Dr. Gatell multiple times in 2003.  On June 25, 2003, Dr. Gatell noted that Plaintiff complained of "generalized trigger p[oints]," but these were "much improved."  (A.R. 250.)  On September 18, he observed that a musculoskeletal examination "show[ed] diffuse areas of trigger points."  (A.R. 245.)

In 2005, after moving to Massachusetts, Plaintiff began visiting two doctors in Pittsfield: Dr. Eugene Heyman, his primary care physician, and Dr. Edmund Hornstein, a rheumatologist.  On February 21, 2005, Plaintiff visited Dr. Hornstein, who diagnosed chronic fatigue and fibromyalgia, noting that Plaintiff's condition was "stable and improved compared to baseline."  (A.R. 302.)

4

In October 2005, Plaintiff again visited Dr. Hornstein who diagnosed "refractory fibromyalgia, stable and improved compared to baseline," and advised Plaintiff "to taper and discontinue chronic narcotic use." (A.R. 301.) Dr. Hornstein saw Plaintiff every six months through December 31, 2007, the date he was last insured.

During this period, Plaintiff also met with his primary care physician, Dr. Heyman, who noted a normal gait, station, and range of motion. Dr. Heyman also diagnosed fibromyalgia, hyperlipidemia, degenerative arthritis, a hearing impairment, obstructive sleep apnea, and fatigue. (A.R. 139, 215-16, 305-06.) Later, in March 2008, Dr. Heyman described Plaintiff as suffering from "significant fibromyalgia and chronic pain." (A.R. 423.)

On December 26, 2007, Plaintiff underwent a consultative physical examination by Dr. Kautilya Puri. Dr. Puri noted "a few trigger points on [Plaintiff's] neck and back bilaterally." (A.R. 357.) Dr. Puri diagnosed fibromyalgia with a history of chronic fatigue syndrome, depression, status post microdiscectomy, history of sleep apnea, and bilateral decreased hearing. (A.R. 355-58.)

C.  Treating Physicians' Opinions.

On March 13, 2008, Dr. Hornstein completed two physical residual functional capacity ("RFC") questionnaires.  (A.R. 412-21.)  Dr. Hornstein diagnosed Plaintiff with fibromyalgia, chronic fatigue syndrome, degenerative disc disease, anxiety, and depression.  (A.R. 412.)  He also indicated that Plaintiff's fatigue and other symptoms would "frequently" interfere with his ability to maintain attention and concentration (between thirty-four percent and sixty-six percent of an eight-hour working day), but that he was capable of low stress jobs.  (A.R. 413.)  Dr. Hornstein stated that Plaintiff could sit, stand and/or walk for less than two hours each in an eight-hour workday; could frequently lift less than ten pounds and could occasionally lift up to ten pounds; could occasionally twist, stoop, and crouch; could rarely climb stairs; and was limited in his abilities to use his hands, fingers, and arms for repetitive tasks.  (A.R. 414.)

Assessing Plaintiff's fibromyalgia diagnosis in particular, Dr. Hornstein noted the presence of "multiple tender points" and concluded that pain was precipitated by

stress, fatigue, movement/overuse, cold, and remaining in a
static position.  (A.R. 417-18.)  Based on Plaintiff's
ailments, Dr. Hornstein estimated that Plaintiff would miss
approximately four days of work per month.  (A.R. 415.)

On March 26, 2008, Dr. Heyman also completed a physical
RFC questionnaire.  (A.R. 425-29.)  He diagnosed
fibromyalgia with symptoms of "chronic pain."  (A.R. 425.)
Dr. Heyman stated that Plaintiff's symptoms constantly
interfered with his ability to maintain attention and
concentration, and impaired his movement, leading Dr. Heyman
to conclude that Plaintiff was "incapable of even 'low
stress' jobs."  (A.R. 426-28.)  Dr. Heyman opined that
Plaintiff "could not sit for any significant length of time"
and concluded, "I don't think he is capable of regular
work."  (A.R. 427-28.)

When presented with a hypothetical based on these
assessments, the vocational expert ("VE") concluded that
Plaintiff "would not be . . . employable."  (A.R. 70.)

D.    State Agency Opinions.

On January 15, 2008, Dr. Malin Weeratne, a state agency
physician, reviewed the records to determine Plaintiff's

physical RFC.  Dr. Weeratne concluded that Plaintiff could lift ten pounds frequently and twenty pounds occasionally; could sit, stand, and/or walk for six hours in an eight-hour work day; and had no limitations in pushing or pulling.  Dr. Weeratne found that Plaintiff would be limited to occasional climbing, stooping, crouching and crawling, and should avoid concentrated exposure to cold.  In sum, Dr. Weeratne found that Plaintiff should be able to perform light exertional duties.  (A.R. 375-82.)

On December 6, 2007, Dr. Brian O'Sullivan, a state agency psychologist, reviewed the records to determine Plaintiff's mental RFC.  Dr. O'Sullivan found moderate limitations in the ability to carry out detailed instructions, maintain concentration, keep to a schedule, and respond appropriately to changes in the work setting. He also noted moderate restrictions in activities of daily living, as well as concentration, but no limitations in social functioning and no episodes of decompensation.  (A.R. 331-48.)

E.    ALJ's Findings.

The ALJ made a finding at Step One of the disability

8

adjudicative process that Plaintiff had not engaged in substantial gainful work activity after November 18, 2002. (A.R. 23.)  At Step Two he stated that Plaintiff had the following severe impairments: fibromyalgia, degenerative disc disease, and obstructive sleep apnea.  (Id.)  The ALJ concluded at Step Three that Plaintiff did not have a Listing-level impairment.  (A.R. 24-25.)  At Step Four, the ALJ stated that Plaintiff was able to perform his past relevant work, and denied his claim on this basis.  (A.R. 29.)

In making his Step Four determination, the ALJ stated that Plaintiff was capable of "light work" (sitting or standing and walking each for at least six hours in a work day) with the ability to lift ten pounds for at least six hours daily and to lift twenty pounds for at least two hours daily (occasional lifting).  He precluded Plaintiff from working at heights, outside, in a noisy environment, requiring overhead reaching or lifting, or involving his left foot or leg controls.  He limited Plaintiff to occasional stooping, crouching, crawling, or kneeling.  He also limited Plaintiff to only simple, unskilled tasks, and

work involving only occasional contact with the public and co-workers.  (A.R. 25.)

The VE testified that a worker with the above RFC could return to Plaintiff's past relevant work and could also work as a mail clerk, parking lot attendant, and electronics worker.  (A.R. 65.)  On this basis, the ALJ denied the claim.  (A.R. 29.)  Significantly, the ALJ afforded only "diminished weight" to the opinions of Plaintiff's treating physicians, Dr. Heyman and Dr. Hornstein, because, in his opinion, they were "conclusory and against the weight of the record as a whole."  (A.R. 28.)  The ALJ also discounted Plaintiff's own reports of his perceived limitations, listing the various household chores Plaintiff performed and holding that "the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely plausible to the extent alleged."  (A.R. 26.)  In contrast, the ALJ gave "significant weight" to the opinions of Dr. Weeratne and Dr. O'Sullivan because their opinions were consistent with the evidence on record and were not contradicted.  (Id.)

F.   Decision Review Board.

On June 22, 2009, the Decision Review Board reversed the ALJ's determination that Plaintiff could return to his past, skilled work as a computer operator because the ALJ had already limited him to only unskilled work. The Board then upheld the denial of Plaintiff's claim. The Board also refused to apply Social Security's exception to the "grid" rules, meaning that it refused to treat Plaintiff as if he had been fifty-five when he applied, even though his fifty-fifth birthday was only thirty-six days later, on February 5, 2008.

### III.  DISCUSSION

Plaintiff argues (1) that the ALJ failed to give proper weight to the opinions of treating sources; (2) that Defendant failed to meet his burden at Step Five; (3) that the ALJ made an invalid credibility assessment; and (4) that the ALJ mechanically applied the grid rules.  Given that the court is persuaded by Plaintiff's first argument, as detailed below, it need not address the remaining three.

### A.  Standard of Review.

Judicial review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the

Commissioner's decision, and (2) whether the Commissioner applied the correct legal standards. <u>Seavey v. Barnhart</u>, 276 F.3d 1, 9 (1st Cir. 2001). The responsibility for weighing conflicting evidence and resolving issues of credibility belongs to the Commissioner and his designee, the administrative law judge. <u>See</u> <u>id.</u> at 10. The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Accordingly, the court must affirm the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d at 218, 222 (1st Cir. 1981). This is true "even if the record arguably could justify a different conclusion." <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

B.    <u>Whether the ALJ Failed to Give Proper Weight to the Opinions of Treating Physicians</u>.

Plaintiff contends that the ALJ erred by failing to give proper weight to the opinions of his treating physicians, Drs. Hornstein and Heyman.

As a general rule, the ALJ should give "more weight to the opinions from the claimant's treating physicians, because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairments."   20 C.F.R. § 404.1527(d).  A treating source's opinion is entitled to controlling weight when it is well supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1527(d); Social Security Ruling ("SSR") 96-2p.  Put differently, the ALJ may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record.   Shaw v. Sec'y of Health and Human Servs., 25 F.3d 1037, 1994 WL 251000, at *3-4 (1st Cir. 1994).

Here, as noted, the ALJ afforded "diminished weight" to the opinions of Dr. Heyman and Dr. Hornstein because they were "conclusory and against the weight of the record as a whole."  (A.R. 28.)  Plaintiff contends that these opinions

13

were not conclusory and were "substantially more detailed"

than the reviewers' assessments. (Dkt. No. 13, Pl.'s Mem.

at 12.) Plaintiff also asserts that the opinions could not

be "against the weight of the record as a whole" because

most of the record derives from the physicians' own

consultations with Plaintiff. Finally, and most

importantly, Plaintiff argues that the ALJ erred by

discounting the fibromyalgia diagnoses due to the fact that

they were primarily based on Plaintiff's self-reported pain

symptoms. In particular, Plaintiff points to the following

explanation in the ALJ's decision:

> The conclusions reached in these reports are not
> supported by medically acceptable signs, symptoms,
> and/or laboratory findings. . . . Though the
> claimant carries the diagnosis of fibromyalgia and
> chronic fatigue syndrome, there is no trigger
> point evaluation in the medical evidence of record
> or any reference to particular tender points at
> all. Treatment notes appear to simply be
> prescribing, albeit reluctantly, and monitoring
> the claimant's treatment with narcotic pain
> medication. <u>It is unclear on what basis these
> physicians find such limitations, other than the
> claimant's self-reports of pain</u>.

(A.R. 28 (emphasis added).) Plaintiff argues that the ALJ

has created "an insurmountable hurdle where limitations are

based on a diagnosis of fibromyalgia." (Dkt. No. 13, Pl.'s

Mem. at 13.)

For support, Plaintiff relies on Johnson v. Astrue, 597 F.3d 409 (1st Cir. 2009), in which the First Circuit determined that an ALJ committed error by discounting a rheumatologist's diagnosis of fibromyalgia. In Johnson, the ALJ had criticized the doctor's reliance on the claimant's self-reported pain symptoms, but the First Circuit found these criticisms unwarranted:

> [T]he "need" to rely on claimant's subjective allegations . . . was not the result of some defect in the scope or nature of [the physician's] examinations, nor was it even a shortcoming. Rather, "a patient's report of complaints, or history, is an essential diagnostic tool" in fibromyalgia cases, and a treating physician's reliance on such complaints "hardly undermines his opinion as to [the patient's] functional limitations."

Id. at 412 (quoting Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003)) (emphasis added).

Defendant attempts to distinguish Johnson by stating that, there, the treating physician noted the presence of tender points (i.e., trigger points), while here Plaintiff's treating physicians did not. However, this distinction is only partially true and not dispositive of the issue.

15

It is true that Dr. Heyman did not discuss the presence
of tender points in his evaluation of Plaintiff; however,
Drs. Hornstein, Gatell, and Puri did.  (A.R. 245-50, 357,
417-18.)  Significantly, every treating physician whose
notes appear in the record -- Dr. Gatell, Dr. Heyman, Dr.
Hornstein, and Dr. Puri -- diagnosed Plaintiff with
fibromyalgia.  Even Dr. Weeratne, the only state agency
physician to evaluate Plaintiff's physical RFC, noted the
presence of trigger points in Plaintiff's back and diagnosed
Plaintiff with fibromyalgia.  (A.R. 377.)  Thus, even if Dr.
Heyman's fibromyalgia diagnosis is subject to criticism for
failing to discuss the presence of tender points, the
unanimity among Plaintiff's treating physicians renders this
point a nullity.[2]

---

[2]  To the extent that Defendant criticizes the
generality of the language used by Plaintiff's treating
physicians in discussing tender points, it is worth noting
that the physician in Johnson apparently did not offer a
detailed explanation of the degree or location of tender
points either, yet the First Circuit found his opinion
reliable.  Johnson notes that fibromyalgia is "[a] syndrome
of chronic pain of musculoskeletal origin but uncertain
cause" and "the American College of Rheumatology . . . has
established diagnostic criteria that include 'pain on both
sides of the body, both above and below the waist, [and]
point tenderness in at least 11 of 18 specified sites.'"
Johnson, 597 F.3d at 410 (quoting Stedman's Medical

Stated differently, the presence or absence of tender points weighs on the determination of whether a patient has fibromyalgia. But once it is determined that the patient suffers from fibromyalgia, the physician must rely on the patient's self-reported pain symptoms as an "essential diagnostic tool" in determining the patient's limitations. See Johnson, 597 F.3d at 412. Here, given that Plaintiff unquestionably suffers from fibromyalgia, the ALJ "had no choice but to conclude that the claimant suffered from the symptoms usually associated with such condition, unless there was substantial evidence in the record to support a finding that claimant did not endure a particular symptom or symptoms." Id. at 414 (citation omitted) (emphasis in original). The fact that Plaintiff's treating physicians relied on his self-reports of pain in reaching an opinion concerning his limitations was not only proper, but

_____

Dictionary 671 (27th ed. 2000)). Despite these fairly specific diagnostic criteria, the claimant's physician in Johnson simply "noted the presence of multiple tender points and, at this time, made a diagnosis of fibromyalgia." Id. at 410. Nonetheless, the First Circuit held that the ALJ's rejection of that physician's diagnosis was erroneous. Id. at 414.

necessary given the nature of his affliction.  See id.
Thus, discounting the opinions of Drs. Heyman and Hornstein
for that very reason was error.

This court's conclusion is underscored by the fact that
here, as in Johnson, "the Commissioner points to no
instances in which any of claimant's physicians ever
discredited [his] complaints of such pain."  Id. at 414.  In
fact, even Dr. Weeratne concluded that Plaintiff's
complaints were "credible, as his allegations are supported
by the [medical records]."  (A.R. 377.)

Relatedly, affording "significant weight" to the
opinions of the two state agency physicians was also error.
Although the ALJ stated that these opinions were
"consistent" with available medical evidence and were "not
contradicted," a cursory reading of the administrative
record indicates otherwise.  (A.R. 28.)  Surprisingly, when
asked to indicate whether there are "treating/examining
source conclusions about the claimant's limitations or
restrictions which are significantly different from your
findings," Dr. Weeratne answered "no."  (A.R. 381.)  Yet,
that is plainly not the case; clearly, there were

significantly different conclusions about Plaintiff's
limitations in the record.

Unlike Dr. Weeratne, Dr. Hornstein determined, among
other things, that Plaintiff's symptoms would "frequently"
interfere with his ability to maintain attention and
concentration; limited his abilities to use his hands,
fingers, and arms for repetitive tasks; and would cause him
be absent from work about four days per month.  (A.R. 413-
14.)  Dr. Heyman stated that Plaintiff's symptoms
"constantly" interfered with his ability to maintain
attention and concentration, and impaired his movement,
leading Dr. Heyman to conclude that Plaintiff was "[not]
capable of regular work."  (A.R. 428.)  Dr. Weeratne's
failure to even recognize this inconsistency is troublesome,
especially given that the questionnaire expressly requires
state agency physicians to "explain why [the opinions of
treating sources with whom you disagree] are not supported
by the evidence in the file."  (A.R. 381.)

Moreover, Dr. Weeratne's inability to discuss
Plaintiff's pain symptoms with him or observe him at all
provides another reason for skepticism.  As a non-examining

physician, Dr. Weeratne was deprived of hearing first-hand Plaintiff's self-reports of pain -- as noted, an essential diagnostic tool in fibromyalgia cases.  He also could not make his own independent observations of Plaintiff's mobility or immobility.  Thus, given the limitations inherent in Dr. Weeratne's evaluation, along with his unexplained departure from the well-supported opinions of Plaintiff's treating physicians, it was error to place significant weight on Dr. Weeratne's opinion.

In sum, the ALJ improperly discounted the opinions of Drs. Heyman and Hornstein, in light of <u>Johnson v. Astrue</u>, 597 F.3d 409 (1st Cir. 2009), and improperly gave significant weight to the opinion of Dr. Weeratne.  Had the ALJ based his hypothetical on the assessments given by Plaintiff's treating physicians, the VE would have concluded that Plaintiff "would not be . . . employable."  (A.R. 70.)

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 12) is hereby ALLOWED, and the Commissioner's Motion to Affirm the Decision of the Commissioner (Dkt. No. 15) is hereby DENIED.  The clerk will

enter judgment for Plaintiff.  The case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge